### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

```
-----------------------------X
UNITED STATES OF AMERICA       :
                               :
v.                             :   Crim. No. 3:03CR00361(AWT)
                               :
ALFRED JENNINGS                :
-----------------------------X
```

### RULING ON MOTION TO SUPPRESS

Defendant Alfred Jennings is charged with a single count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).  The defendant moved that all evidence seized after his arrest be suppressed, arguing that all such evidence was seized after an illegal warrantless arrest.  Specifically at issue are:  (1) a Browning 9 millimeter handgun, which was fully loaded and which the defendant had in his possession and abandoned prior to his arrest; (2) a small knotted bag containing crack cocaine that was found on the defendant's person following a search incident to his arrest; and (3) the defendant's statement that he did not have a permit for the handgun.  An evidentiary hearing was conducted on May 3, 2005, and adjourned to give the defense an opportunity to locate a witness.  The court was subsequently informed that the witness could not be located and there is no need to continue the hearing.

For the reasons set forth below, the court has previously informed the parties that the defendant's motion to suppress is being denied.

## I. Findings of Fact

At all times material to this case, Tarequl Ambia was the owner of an apartment building located at 214 Westland Street, Hartford, Connecticut.  The building was commonly known as 7 Love Lane.  The entrance to 7 Love Lane consists of a self-locking pink door, which cannot be entered without a key.  Inside that door, there is a common staircase that leads up to the various apartments in the building.  Initially, there is a set of four stairs leading to the first floor.  There are two apartments on the first floor.  Then, another set of stairs leads to a landing, which is directly above the pink door (the "Lower Landing").  There is a window on the Lower Landing that is set relatively low in the wall, i.e. at waist level for a person of average height.  The next set of stairs leads from the Lower Landing to the second floor, where there are additional apartments.  From the second floor, another set of stairs leads to a landing between the second and third floors (the "Top Landing"), where there is another window, which is set significantly higher in the wall than its counterpart a floor below.  The steps from the Top Landing lead up to the third floor.  There are no stairs leading up from the third floor.

On April 27, 2003, Ambia, acting on his own initiative, filed a Standing Complaint with the City of Hartford Police Department in connection with 7 Love Lane.   The Standing

Complaint stated that Ambia had previously complained to the police about individuals continuously loitering at the premises, gambling, soliciting, selling and using illegal drugs while blocking pedestrian traffic, and creating disturbances.  The Standing Complaint authorized the Hartford Police Department "to take whatever action [is] deemed necessary to correct this condition . . . ." (Gov't Ex. 21.)  Pursuant to the Standing Complaint, Ambia asked to have "any criminal or civil violations enforced and all violators cited and/or arrested for said violations."  (Id.)  In connection with his filing of the Standing Complaint, Ambia provided keys so that officers could get into the building.  Ambia does not recall whether he gave keys to Officer Paul Cicero.

On July 15, 2003, Officer Paul Cicero was a patrol officer with the City of Hartford Police Department, and Cicero was assigned to an area in the North End of Hartford, which included the premises at 7 Love Lane.  The building is located in an area known as "Five Corners," which is an intersection where Westland Street, Garden Street and Love Lane all come together.  "Five Corners" is designated a "hot spot" by the Hartford Police Department, i.e. an area where there are frequent incidents of drug-related crimes, violent crimes and/or gun-related crimes. Five Corners is one of the principal "hot spots" in the City of Hartford, and the department focuses significant attention on

3

that location because of the frequency of, _inter_ _alia_, street level drug dealing.

At this time there was frequent drug dealing activity in front of 7 Love Lane on a daily basis.  Drug dealers often used 7 Love Lane as a base of operations and emerged from the building to conduct a hand-to-hand transaction with a pedestrian or with the occupant of a car that pulled up in front of the building. When conducting such a transaction, the dealers usually propped the pink door open with a stick or by some other means.  Dealers who became aware of a police presence would run back into the building and close the self-locking pink door behind them, thereby preventing police access to the building.  Drug dealing activity in this area intensified at night.  Prior to July 15, 2003, Officer Cicero, individually and with others, had made many narcotics-related arrests in the vicinity of 7 Love Lane.

Prior to July 15, 2003, after having routinely observed drug trafficking activity in front of 7 Love Lane and having received complaints about such activity from residents of the area, Officer Cicero checked to determine whether any Standing Complaints were in effect for 7 Love Lane, and he became aware of the April 27, 2003 Standing Complaint filed by Ambia.  On or about July 13 or July 14, 2005, Officer Cicero requested and received a key to 7 Love Lane from a person he understood to be the owner of the building.

At approximately 12:30 a.m. on July 15, 2003, Officer Cicero was on duty in the Five Corners area.  He was seated in his police cruiser, writing reports, approximately 70 yards from the entrance to 7 Love Lane.  The area was lit by several street lights.  The light in the Top Landing at 7 Love Lane was on.  The light in the Lower Landing, which is directly above the pink door, was not on, but there was a little bit of illumination and the window on the Lower Landing was open.

Between approximately 12:30 a.m. and 1:00 a.m., Officer Cicero noticed an individual, later identified as the defendant, emerge from the building, prop the door open with a stick, and engage in what appeared based on Cicero's training and experience to be a hand-to-hand drug sale with a person in an automobile. After the transaction was completed, Officer Cicero observed the defendant return to the building and then saw him on the Lower Landing.  A short time later, Officer Cicero saw the defendant engage in what appeared to be another drug sale, this time with a pedestrian, and again return to the Lower Landing.  On each occasion, Officer Cicero drove by the front of 7 Love Lane after observing the defendant's conduct and confirmed, based on the clothes the individual was wearing, that the individual on the Lower Landing was the same individual he had observed engaging in what appeared to be a drug deal.

After making these observations, Officer Cicero contacted

his supervisor and obtained permission to engage in proactive investigation, once he obtained back-up.  Officer Cicero contacted Officer James Dugan, who was on patrol nearby, and asked for his assistance in investigating activity at 7 Love Lane.  When Officer Dugan arrived, Officer Cicero explained that he had a key to the building and that, in light of the fact that there was a Standing Complaint in effect for 7 Love Lane, he wanted to investigate the individual he had been observing and see if he lived in the building.

The officers parked their cruisers on Eastland  Street so they could not be seen and walked along the side of the building out of sight from the window on the Lower Landing.  Officer Cicero used a key to open the pink door.  The entrance way was dark.  The officers turned on their flashlights and began walking up the stairs.  Both officers were in uniform.  As they passed apartments on the first floor and moved up the stairs to the Lower Landing, their flashlights lit up the area.  They saw the individual Officer Cicero had seen earlier.  The individual had a gun in his right hand and began to run up the stairs.  Officer Cicero yelled "gun," and he and Officer Dugan drew their weapons. While the defendant was running, Officer Cicero commanded him to stop and identified himself as a police officer.  The defendant did not comply.

The officers chased the defendant up the stairs.  When the

6

defendant reached the Upper Landing, he tried to discard the gun he was carrying by jumping up and putting it on the ledge of the window, which is set significantly higher than the window on the Lower Landing.  At that point, the defendant stopped running, obeyed a command to get on the ground, and offered no further resistance.

At this point, Officer Cicero handcuffed the defendant. Then, having concluded that the defendant was under arrest for, at a minimum, interfering with a police officer, Officer Cicero performed a full custodial search of the defendant's person during which he discovered a clear bag with a yellowish white rock-like substance that appeared to be crack cocaine.  The substance was field tested and the results were positive for crack cocaine.

Officer Cicero then reported to his dispatcher over his radio that he had "an 83," which is a code for a gun.  Several additional officers were dispatched to the scene as a safety precaution.  Meanwhile, Officer Dugan secured the gun, which was fully loaded and had a bullet in the chamber.

After the additional officers arrived, Officer Cicero took the defendant outside and advised him of his <u>Miranda</u> rights, and the defendant acknowledged.  No physical force or threats were used against the defendant to get him to answer questions, and he was not otherwise pressured into answering questions.  The

7

defendant spoke and understood English.  The defendant did not appear to be impaired or otherwise unable to make a decision as to whether to answer questions.  When the defendant was asked where he had obtained the gun, he did not respond.  When the defendant was asked whether he had a permit for the gun, he responded that he did not.  The only other questions the defendant was asked were concerning his name and address and whether he lived at 7 Love Lane.

The defendant was charged with interfering with a police officer in violation of Conn. Gen. Stat. § 53a-167a.  He was also charged with possession of narcotics in violation of Conn. Gen. Stat. § 21a-279(a), possession of narcotics within 1500 feet of a school in violation of Conn. Gen. Stat. § 21a-279(d), carrying a pistol without a permit in violation of Conn. Gen. Stat. § 29-35, criminal possession of a handgun in violation of Conn. Gen. Stat. § 53a-217, and criminal trespass in the first degree in violation of Conn. Gen. Stat. § 53a-107.

## II. Discussion

### A.   Seizure of the Gun and Ammunition

Under the Fourth Amendment, a seizure occurs when a police officer, by means of physical force or a show of authority, has in some way restrained the liberty of a citizen.  Terry v. Ohio, 392 U.S. 1, 19, n. 16 (1968).  The mere fact that the officers entered the building at 7 Love Lane with the intent of

investigating the defendant's activities did not amount to a seizure.  An officer may stop and detain an individual for investigative purposes, "if the officer has a reasonable suspicion that criminal activity may be afoot."  United States v. Vargas, 369 F.3d 98, 101 (2d Cir.2004) (internal quotation marks and citation omitted).

The investigatory detention of the defendant was justified. Five Corners was known to Officer Cicero to be a location where street level narcotics sales occurred on a frequent basis, particularly in front of 7 Love Lane.  Officer Cicero had frequently observed street level drug activity taking place at 7 Love Lane.  This activity had included "hand-to-hand" transactions with a party walking up and drive-thru transactions where the car pulled up, beeped the horn or flashed its lights and someone ran down from the building and a hand-to-hand transaction was made through the window of the car and the car then drove off.  These types of transactions were "an every day issue" for Officer Cicero as he patrolled 7 Love Lane.  (Hr'g Tr. 25.)  Officer Cicero had also frequently observed drug dealers run into 7 Love Lane and close the pink door behind them, which locked the door, when they detected a police presence in the area.

On July 15, 2003, Officer Cicero observed the defendant on at least two occasions as he propped the door to 7 Love Lane open

with a stick and conducted what appeared to be street level drug sales.  On each occasion, Officer Cicero then observed the defendant retreat to the Lower Landing after closing the door to the building behind him.  These facts constituted articulable facts supporting a reasonable suspicion by Officer Cicero that criminal activity was afoot, and he was therefore justified in stopping and detaining the defendant for investigatory purposes.

In addition, by itself and in conjunction with Officer Cicero's earlier observations, the defendant's flight at the officers' approach justified an investigatory detention.  The officers, who were in uniform, observed as the defendant, who had a gun in his hand, ran away as they approached him.  The officers identified themselves and ordered the defendant to stop.  The defendant's unprovoked flight from Officers Cicero and Dugan under these circumstances also provided reasonable suspicion for a <u>Terry</u> investigatory stop.  <u>See</u> <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124-125 (2000) (holding that defendant's unprovoked flight from police in a high crime area constitutes reasonable suspicion for a <u>Terry</u> investigatory stop); <u>Vargas</u>, 369 F.3d at 101 (same).

The defendant was not seized during his flight.  Under the Fourth Amendment, a seizure occurs when a police officer, by means of physical force or a show of authority, has in some way restrained the liberty of a citizen.  <u>Terry</u>, 392 U.S. at 19 n.16. Where a suspect fails to submit to an officer's show of authority

and runs, he is not seized until he is apprehended.  <u>California</u>
<u>v. Hodari D.</u>, 499 U.S. 621, 628-29 (1991).  Therefore, defendant
Jennings was not seized until he stopped running and was
handcuffed, both of which took place after he discarded the gun.

Because the defendant discarded the gun while he was still
fleeing, it was not the fruit of any seizure and his act of
abandonment extinguishes any Fourth Amendment rights he had with
respect to the  gun and ammunition.  <u>See</u> <u>California v. Greenwood</u>,
486 U.S. 35 (1988) (warrantless seizure of trash deposited
curbside for collection was valid as abandonment of the garbage
negated any reasonable expectation of privacy in it); <u>Abel v.</u>
<u>United States</u>, 362 U.S. 217, 241 (1959) (a warrantless search or
seizure of abandoned property is not a violation of the Fourth
Amendment); <u>United States v. Sealey</u>, 30 F.3d 7, 10 (1st Cir.
1994) (gun and ammunition discarded by defendant while fleeing
from officers was abandoned and has no Fourth Amendment
implication); <u>United States v. Segars</u>, 31 F.3d 655 (8th Cir.
1994) (cocaine tossed away while running from officers was
abandoned and enjoys no Fourth Amendment protections); <u>United</u>
<u>States v. Moskowitz</u>, 883 F.2d 1142, 1147 (2d Cir. 1989) (Fourth
Amendment protections do not extend to abandoned property);
<u>United States v. Arboledo</u>, 633 F.2d 985 (2d Cir. 1980), <u>cert.</u>
<u>denied</u>, 450 U.S. 917 (1981) (defendant had no legitimate
expectation of privacy with respect to cocaine he threw out

11

window as officers approached his apartment door).  Therefore, the defendant's motion to suppress the gun and the ammunition should be denied.

**B.   Seizure of the Crack Cocaine**

Defendant Jennings' conduct in fleeing from the officers, and continuing to run after the officers had identified themselves as police officers and ordered him to stop, provided probable cause to arrest him for interfering with an officer in violation of Conn. Gen. Stat. § 53a-167a.  That statute provides in pertinent part that:

> A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer . . . in the performance of such peace officer's . . . duties.

Section 53a-167a is broad in its scope, and in enacting that statute, "the legislature sought to prohibit behavior that hampers the activities of the police in the performance of their duties." In re Adalberto S., 27 Conn. App. 49, 56, 604 A.2d 822, 826 (1992), cert. denied, 222 Conn. 903, 606 A.2d 1328 (1992) (citation omitted). The purpose of the statute is "to ensure orderly compliance with the police during the performance of their duties; any act intended to thwart this purpose violates the statute." Id. (citation omitted).  A person who flees from officers engaged in the performance of their duties may be found to have interfered within the meaning of § 53a-167a. See, e.g., State v. Hampton, 66 Conn. App. 357, 375-376, 784 A.2d 444, 456-

12

457 (2001).  Therefore, the officers had probable cause to arrest
defendant Jennings for interfering with an officer in violation
of Conn. Gen. Stat. § 53a-167a.

Because the officers had probable cause for a custodial
arrest of the defendant, their search of the defendant incident
to that arrest was lawful.

> A custodial arrest of a suspect based on probable cause
> is a reasonable intrusion under the Fourth Amendment;
> that intrusion being lawful, a search incident to the
> arrest requires no additional justification. It is the
> fact of the lawful arrest which establishes the authority
> to search, and we hold that in the case of a lawful
> custodial arrest a full search of the person is not only
> an exception to the warrant requirement of the Fourth
> Amendment, but is also a `reasonable' search under that
> Amendment.

United States v. Robinson, 414 U.S. 218, 235 (1973) (where
officer had probable cause to arrest defendant for driving a car
after revocation of his license and conducted a search of
defendant's person, during which heroin was found in cigarette
package, search was proper as incident to arrest).

Therefore, because the crack cocaine seized from the
defendant was discovered during a permissible search incident to
an arrest supported by probable cause, his motion to suppress the
drugs should be denied.

C.   **The Defendant's Statement**

When a person is subject to "custodial interrogation," he
must be advised of his Miranda rights. See United States v.
Mathurn, 148 F.3d 68, 69 (2d Cir.1998) (per curiam). The

government "has the burden of establishing by a preponderance of the evidence that the suspect waived his <u>Miranda</u> rights and that his statement was 'truly the product of free choice.'" <u>United States v. Ramirez</u>, 79 F.3d 298, 304 (2d Cir. 1996) (quoting <u>United States v. Anderson</u>, 929 F.2d 96, 99 (2d Cir. 1991)).  A defendant may waive his <u>Miranda</u> rights, but the waiver must be knowing and voluntary. "A voluntary relinquishment of a right occurs when the relinquishment is the product of a free and deliberate choice rather than intimidation, coercion, or deception." <u>United States v. Male Juvenile</u>, 121 F.3d 34, 41 (2d Cir. 1997) (internal quotation marks omitted).

Defendant Jennings waived his right to remain silent.  He was advised of his <u>Miranda</u> rights, and he acknowledged.  He asserted those rights by declining to answer a question as to where he had obtained the gun that was in his possession. Moreover, there is no evidence that the statement was anything but voluntary.

Courts will generally not protect a defendant from his own voluntary decisions and "are not required to divine a defendant's motivation for speaking or acting as he did when there is no claim that governmental conduct coerced his decision." <u>United States v. Salameh</u>, 152 F.3d 88, 117 (2d Cir. 1998) (internal citation and quotation marks omitted).  Here, the defendant has not shown any coercive law enforcement conduct.  Rather, the

14

defendant merely contends the statement should be suppressed because he was asked whether he had a permit after he declined to answer Officer Cicero's first question regarding where the defendant had obtained the gun.  However, it is well-established that a defendant may selectively waive his right to remain silent by deciding to "respond to some questions but not others." United States v. Thierman, 678 F.2d 1331, 1335 (9th Cir. 1982) (citations omitted); see also Ramirez, 79 F.3d at 303-04 (where defendant answered some questions and refused to answer others, he did not unequivocally invoke right to remain silent); United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir. 1987) ("An accused's decision to answer some questions, but not others, further supports a finding of an implied waiver-the accused's selective responses suggest an understanding of the right not to respond.").  Therefore, the defendant's motion to suppress his statement that he did not have a pistol permit should be denied.

## III. Conclusion

Accordingly, the defendant's Motion to Suppress Evidence (Doc. No. 28) is hereby DENIED.

It is so ordered.

Dated this 18th day of August 2005, at Hartford, Connecticut.

_____/s/_____
Alvin W. Thompson
United States District Court

15